IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero

| | |
|---|---|
| In re:<br><br>ADAM AIRCRAFT INDUSTRIES, INC.,<br><br>Debtor.<br><br>JEFFREY A. WEINMAN, TRUSTEE<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PUEBLO, COLORADO,<br>et al.,<br><br>Defendants. | Case No. 08-11751MER<br><br>Chapter 7<br><br><br><br>Adversary No. 09-1481 MER<br><br><br><br><br><br><br><br><br>Signed/Docketed<br>March 23, 2012 |

**ORDER VALUING PUEBLO COLLATERAL, ALLOWING PARTIAL SURCHARGE, AND DETERMINING PRIORITY OF TAX LIEN**

    The United States Bankruptcy Court for the Northern District of Ohio has accurately observed: "In reality, few cases deal with valuation in the allocation context."[1] That is, while many cases address valuation of a debtor's assets in the context of determining entitlement to relief from stay, the amount a secured creditor must be paid under a plan, etc., very little guidance exists for a court attempting to arrive at the appropriate valuation to determine the distribution of proceeds in a case in which sale of the debtor's assets has already taken place. Like the *LTV* Court, that is the task before the Court in this case.

    The Chapter 7 Trustee, Jeffrey Weinman (the "Trustee") initiated this adversary proceeding by filing a Complaint against thirteen defendants, seeking an order determining the extent, validity, and priority of the liens and secured claims which may be asserted by the defendants against the proceeds of the sale of substantially all the estate's assets for approximately $10 million. All of the defendants except the City of Pueblo ("Pueblo") and intervenor-defendant George F. "Rick" Adam, Jr. ("Adam")

---

[1] *In re LTV Steel Company, Inc.*, 285 B.R. 259, 266 (Bankr. N.D. Ohio 2002).

entered into releases resolving the claims set forth in the Complaint. Thereafter, the Court held a trial on the Complaint and allowed written closing arguments.[2]

## BACKGROUND FACTS

Adam Aircraft Industries, Inc. (the "Debtor") was engaged in the design and manufacture of carbon composite aircraft and airframes. The Debtor operated facilities in Centennial, Colorado, Pueblo, Colorado, and Ogden, Utah. On February 1, 2003, the Debtor and Pueblo entered into a financing agreement to facilitate the Debtor's expansion in Pueblo with the goal of creating a certain number of jobs at the Pueblo location. The agreement provided Pueblo would advance up to $1.74 million to the Debtor for the purchase of equipment.[3] This advance was personally guaranteed by Adam, then the CEO of the Debtor. The advance was secured by all equipment and all after-acquired equipment at the Pueblo facility (the "Pueblo Collateral"). Pueblo properly perfected its security interest in the Pueblo Collateral. In January 2008, Pueblo formally declared the Debtor in default and sued Adam on the personal guaranty in state court. On May 11, 2010, the state court entered judgment against Adam in the amount of $1,860,000.00.

On February 15, 2008, the Debtor filed its voluntary petition for relief under Chapter 7. Less than two months later, on April 9, 2008, this Court entered its *Findings of Fact, Conclusions of Law, and Order Authorizing and Approving: (1) the Sale of Substantially All Assets Free and Clear of Liens, Claims, Interests and Encumbrances, and (2) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale* (the "Sale Order").[4] The Sale Order approved an Asset Purchase Agreement for the sale of substantially all of the Debtor's assets to a third-party purchaser for the purchase price of $10 million (the "Sale Proceeds").[5]

---

[2] In addition, pursuant to the Court's post-trial order, the Trustee submitted a summary of claims filed in the bankruptcy proceeding, indicating which claims had been the subject of objections, compromises, or other adjustments to the amount stated in the proof of claim. The Court found this information helpful in evaluating the Trustee's proposed percentage basis allocation, although the Court later determined such an allocation was inapplicable for the reasons stated herein.

[3] For reasons not clear to the Court, it appears the City of Pueblo actually advanced $2,281,083.00.

[4] Underlying Case Docket No. 213. In addition, on April 14, 2008, the Court granted the Trustee's Motion for Entry of Supplemental Sale Order. Although the Supplemental Sale Order added language to the Sale Order, the modifications are minor and not relevant to the issues currently before the Court.

[5] $2,681,083.00 of the $10 million in sale proceeds was set aside as "the maximum amount recoverable by the city of Pueblo and other putatively secured creditors" pursuant to a stipulation reached by the Trustee with the major secured creditor, Morgan Stanley. See Underlying Case Docket No. 588, Motion to Approve Stipulation, ¶ 9. This Stipulation was approved by the Court on June 10, 2009. Underlying Case Docket No. 610. The first distribution to Morgan Stanley of sale proceeds under this Stipulation was approved in 2009. Underlying Case Docket No. 644. It should be noted the Trustee has also filed an adversary proceeding against Morgan Stanley for equitable subordination of its claim, the

Pursuant to the Sale Order, all liens and against claims to the Debtor's assets attached to the Sale Proceeds with the same validity, priority, force, and effect they had prior to the sale. The sale closed on April 15, 2008.

On June 30, 2008, Pueblo filed proof of claim No. 276 in the amount of $2,281,083.00.[6] Pueblo later designated $1,360,726.00 as secured,[7] leaving $920,357.00 as an unsecured claim.[8] On July 22, 2011, Pueblo transferred $1.5 million of its $2,281,083.00 claim to Adam.[9]

The parties agree "[t]he Purchaser did not allocate or apportion the Sale Proceeds to the assets that were located in Pueblo following the sale, or to the Pueblo Equipment specifically."[10] However, Section 3.2 of the Asset Purchase Agreement provides the purchase price of $10 million "shall be allocated among the Acquired Assets at Debtor's . . . Pueblo, Colorado, [*sic*] facility, and otherwise in accordance with Schedule 3.2, to be agreed upon by the Seller and Purchaser and attached hereto prior to the Closing."[11] Hence, the Asset Purchase Agreement also required the Trustee to

---

resolution of which will affect how the rest of the Sales Proceeds are to be distributed.

The Court also notes although the Motion to Approve Sale and the Sale Order contemplated aggregate sales proceeds of $10 million, the Trustee sought permission from the Court to invest the sales proceeds, indicating the cash received by the estate at closing was $10,137,197.30. Underlying Case Docket No. 298. The Court received no evidence as to the difference in these numbers, but will assume, for purposes of this Order, the $10,137,197.30 stated by the Trustee in the investment motion was accurate as of that date.

[6] Pueblo's initial proof of claim listed $2,281,083.00 as the amount of claim and completed the "item 4 - secured claim" section but did not indicate the value of property securing the claim or the amounts of secured claim and unsecured claim. Hence, Pueblo's proof of claim did not initially designate the claim as secured, unsecured, or partially secured and unsecured. The proof of claim, therefore, was not initially *prima facie* evidence as to the secured and unsecured amounts of the claim but is *prima facie* evidence that the total claim is for $2,281,083.00. However, the parties' Stipulated Facts and Exhibits, ¶ 17 provides: "Pueblo designated $1,360,726.00 as the amount of its secured claim based on the Debtor's 'Equipment Purchases.'" Hence, proof of claim No. 276 provides $1,360,726.00 as the secured claim and $920,357.00 as the unsecured claim.

[7] Stipulated Facts and Exhibits, ¶ 17 provides the basis for this fact although the Court does not know where or how Pueblo "designated" the secured claim.

[8] Stipulated Facts and Exhibits, ¶¶ 16 and 17.

[9] Underlying Case Docket No. 1151. This was the result of a settlement between Pueblo and Adam pursuant to the personal guaranty signed by Adam who confessed judgment of $1,860,000.00. If Adam pays $1.5 million to Pueblo the confessed judgment is deemed satisfied. Stipulated Facts and Exhibits, ¶ 32. The Court does not know how much of the secured claim was transferred and how much of the unsecured claim was transferred.

[10] Stipulated Facts and Exhibits, ¶ 29.

[11] The Seller is Jeffrey A. Weinman, the Trustee. The Purchaser is AAI Acquisition, Inc.

agree upon an allocation prior to the closing, which he failed to do.  The Trustee now requests this Court to value the Pueblo Collateral and allocate sales proceeds, when he himself should have done so, with the participation of the purchaser, more than three years ago.[12]

The parties also agree the Pueblo County Treasurer's records of April 30, 2007, reflect the original cost of the Pueblo Collateral as $1,086,399.00.[13]  The assessed value for 2006 on the Pueblo Collateral was $219,350.00 upon which a tax of $17,492.30 was based.  The same records indicate the assessed value was based on an actual value of $756,330.00.  For tax years 2007 and 2008, the assessed value remained $219,350.00 and the actual value remained $756,330.00.[14]

On June 27, 2008, the Treasurer of Pueblo County filed proof of claim No. 218-2 for personal property tax for tax years 2007 and 2008 in the amount of $35,162.50, which Pueblo County asserted was secured and entitled to be treated as an administrative claim pursuant to 11 U.S.C. § 503.[15]  The Trustee settled the claim for $30,000.00,[16] and asserts this amount constitutes a first priority lien to be deducted from any amount allocated to Pueblo.  In the alternative, the Trustee contends he should recover the $30,000.00 compromised tax claim as a surcharge for *ad valorem* taxes pursuant to § 506(c).

In addition, the Trustee seeks allowance of a surcharge against the Pueblo Collateral for what he alleges to be the reasonable and necessary costs and expenses of preserving and disposing the property securing Pueblo's claim by way of the bulk sale.  He argues he is entitled to surcharge the property of each of the Defendants holding an allowed secured claim a *pro rata* amount no less than 17.75% of the value of the property securing such allowed secured claim.  The Trustee's surcharge claim is based on his testimony of his calculation of the reasonable costs and expenses he incurred operating the Debtor's business and preserving the assets for sale.[17]

---

[12]  The Trustee testified Morgan Stanley held most of the secured claims totaling $72,291,056.75, but agreed even if Morgan Stanley's claims were allowed in their entirety, they are not senior to Pueblo as to the Pueblo Collateral.

[13]  Stipulated Facts and Exhibits, ¶ 27.

[14]  See Pueblo Exhibit F.

[15]  See Trustee Exhibit 11.  Unless otherwise specified, all future statutory references in the text are to Title 11 of the United States Code.

[16]  Underlying Case Docket No. 704.

[17]  The Trustee testified to, and his briefs subsequently sought, a surcharge of 18%.  However, no Amended Complaint was filed, nor was a motion made to conform the Complaint to the evidence.  Accordingly, the Court will only consider a surcharge of 17.75%.  The Trustee's unrebutted testimony was that he incurred $1,813,216.37 in costs and expenses of sale.  17.75 % of this amount is $317,312.86.  However, 17.75% of the value of Pueblo's collateral would be calculated on that number, not the entire

## DISCUSSION

Section 506(a) of the Bankruptcy Code provides the "value [of an allowed secured claim] shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property."[18]  Valuation under § 506(a) thus depends on the purpose and circumstances of each case.  In this case, the value of the Pueblo Collateral must be determined for the purpose of deciding how much of the Sales Proceeds should be allocated to Pueblo on account of its claim secured by the Pueblo Collateral.  The record in the case is at times confusing and incomplete, and the assessments of the parties have occurred long after the assets were sold and no longer available for inspection.  Thus, valuation of the assets for purposes of allocating the Sales Proceeds is necessarily imperfect, but it falls to this Court to make the best determination it can in light of these difficulties.

The United States Supreme Court has stated a foreclosure or distressed-sale standard is inappropriate for purposes of § 506(a), and directs the proper standard is

---

amount.

Specifically, the Trustee testified the following payments were not only related to the sale transaction, but necessary expenses of the sale transaction: 1) general liability insurance check nos. 101 and 102 (necessary to the sale transaction); 2) payments to Mr. Naro, Mr. Young, Mr. Raffaghello, Mr. Tarpo, Mr. Harter, Ms. Kelly, and Mr. Watson, all of whom were employees of the Debtor (necessary to assist the Trustee with running the business); 3) payments for rent for the facilities located in/at Englewood, CO; Hangar 63-1; Hangar 63-7; Hangars 63-5, 63-10, and 63-11; Concord Suite; Ogden; land next to 12876 E. Adam Aircraft; storage unit; Igloos J901, J903, J904, J916, and J917; and Keeler Parker (facilities were a necessary part of conducting the sale because estate had to pay rent as an administrative expense anyway and/or because equipment to be sold was located at various facilities); 4) ViaWest, an online accounting record keeping service to maintain the right to access that information (necessary part of sale); 5) attorneys' fees to Schuchat, Herzon & Brenman, a firm which provided advice concerning exporting technology protected by federal statute (necessary because this area of law was beyond the Trustee's counsel's expertise); 6) utilities (necessary part of sale; 7) cure amounts of lease payments were for leases assumed and assigned (necessary payments in connection to sale transaction); 8) fees to Dickensheet (necessary to secure delicate carbon assets); 9) fees to General Capital Partners (to market and sell the Debtor's assets); 11) compensation to Trustee and his counsel, Lindquist and Vennum (necessary and reasonable fees in connection with a sale of this magnitude).

[18]  11 U.S.C. § 506 states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).

"replacement value."[19] The Court defined "replacement value" as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."[20] In this case, the sale to a willing buyer has already taken place, for a total amount of approximately $10 million. Ultimately, however, "*Rash* charges bankruptcy courts, 'as triers of fact, [with] identif[ying] the best way of ascertaining replacement value on the basis of the evidence presented,' while admonishing them not to use 'a ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases.'"[21]

The burden of proof on a request to value claims rests on the claimant.[22] To make this showing, the claimant must demonstrate both the extent of its lien and the value of the collateral securing that lien.[23] A court should value a secured claim by determining the extent the collateral contributed to the estate's going concern value, and going concern value should be attributed to an asset in proportion to its value in relation to the total value of all of the assets.[24]

Like the *LTV* Court, this Court recognizes numerous paradigms exist for assigning value to the Pueblo Assets for purposes of allocating the sale proceeds. The Court also agrees with the *LTV* Court it would be unfair to apply a paradigm not argued by the parties.[25] Therefore, the Court will discuss the valuation proposals of each party.

---

[19] *Assocs. Comm. Corp. v. Rash (In re Rash)*, 520 U.S. 953, 959-960 (1997).

[20] *Id.*, at 960.

[21] *In re Castleton Plaza, LP*, 2011 WL 4621123, *3 (Bankr. S.D. Ind. September 30, 2011) (Slip copy) (quoting *Rash*, 520 U.S. at 965 fn. 6).

[22] *In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D. N.Y. 2009).

[23] *Id.*

[24] *In re Hawaiian Telcom Communications, Inc.*, 430 B.R. 564 (Bankr. D. Hawai'i 2009) (citing, *inter alia*, *LTV*, 285 B.R. at 267–68; *In re Penz*, 102 B.R. 826, 828 (Bankr. E.D. Okla.1989); *In re 26 Trumbull Street*, 77 B.R. at 375–76).

[25] As stated by the Court in *LTV*:

> The Court considered the development of different paradigms for valuing parts of an enterprise and the related liabilities. The Court gave considerable thought to potential models and concludes that it would be unfair to apply a model that has not be considered or argued by the parties. We proceed with these caveats and regrets in the rear view mirror, but sadly still in sight.

*LTV*, *supra*, at 267.

### A. The Trustee's Position

The Trustee argues the value of the Pueblo Collateral securing Pueblo's claim can be no more than 2.3% of the proceeds, because the Pueblo Collateral represented approximately 2.3% of the value of the Debtor's assets before sale. The Trustee then states the 2.3% should be reduced by the $30,000 senior tax lien already paid to the Pueblo County Treasurer, plus a 17.75% surcharge, previously discussed above.

The Trustee also urges the Court to remember Pueblo's asserted secured claim of $1,360,726.00 is a very small portion of the more than $57 million in secured claims filed in the case. The problem with this second argument, even if it reaches a similar number (2.3% of the sales proceeds), is it compares apples with oranges. The question before the Court is not how the allowed secured claim of Pueblo stacks up against the other secured claims in the case. The question is the value of the Pueblo Collateral, and what portion of that value should be paid, proportionately, from the Sale Proceeds.

In addition, the Trustee contends the Court need not value each piece of equipment which might have been at the Pueblo facility, nor should it consider an actual value or assessed value apart from the bulk sale. Instead, the Trustee believes the Court should consider the gross allocation of 2.3%, because no separate appraisals or bids exist to provide evidence of value of the Pueblo equipment. The problem with this argument is the case law requires the Court to do just the opposite of what the Trustee suggests. The Court must determine the value of individual assets as a portion of the entire sale.[26] Indeed, the Trustee's post-trial brief recognizes this rule.[27] Despite the seductive simplicity and apparent equity of the Trustee's proposal, the Court cannot accept it.

### B. Pueblo's Position

Pueblo points out the Trustee failed to obtain appraisals or other independent valuations of the Pueblo Collateral before the sale, and did not allocate the Sales Proceeds among the Debtor's assets located in Centennial, Colorado and Pueblo, Colorado, as he was required to do under the Asset Purchase Agreement approved by the Sale Order.[28] Pueblo argues the 2.3% figure simply allocates the Sales Proceeds among all secured creditors, regardless of the value of a particular creditor's lien in particular pre-sale collateral.

---

[26] *LTV*, *supra*, at 266 ("The goal is to determine the value of an individual asset as a portion of the whole sale.") (citing, *inter alia*, *Leslie v. Knight Soda Fountain Co. (In re Wilkes)*, 55 F.2d 224 (2nd Cir. 1932); *In re 26 Trumbull Street*, 77 B.R. 374 (Bankr. D. Conn. 1987)).

[27] Trustee's Closing Brief, p. 4, ¶ 5.

[28] See Trustee's Exhibit 14, Exhibit A thereto, p.8.

Pueblo further notes: "[i]n its Schedule B, Exhibit J. . . in the Debtor's bankruptcy case, the Debtor listed $898,560.15 as the book value of personal property listed as located in Pueblo, as of December 31, 2007."[29]  In addition, Pueblo asserts the Debtor's books and records list the Pueblo Assets' depreciated book value at $873,139.88 as of December 31, 2007.[30]

Pueblo also states Mr. Chris Naro ("Naro"), the Debtor's former CFO, depreciated the Pueblo Assets' cost value of $1,375,000 by 40% to arrive at a market value of $550,000.00.  Adam, on the other hand, testified the Pueblo Assets were worth between $1 million and $1.2 million.  Pueblo encourages the Court to consider Adam's opinion of the Pueblo Assets as the best evidence of value, because of his extensive knowledge of these assets and extensive experience in the carbon fiber parts industry.

What Pueblo does not take into consideration in urging the Court to adopt Adam's tesimony is Adam's position as guarantor of the Pueblo loan.  Adam's motivation, therefore, would be to obtain the highest valuation possible, to reduce his exposure as guarantor.  Thus, despite his undisputed expertise and experience, his valuation is not disinterested.

Based on the responsibilities imposed upon it by § 506(a) therefore, the Court must consider the evidence it has, however imperfect, as to the value of the Pueblo Collateral.  That value will then be the amount assigned to the secured claim of Pueblo.  The Court will then determine the appropriateness of the deductions proposed for the Trustee's payment of the Pueblo County tax claims and the Trustee's requested surcharge.

## C. Evidence of Value

The Trustee testified while some of the Pueblo Assets were expensive machinery, much of the property was made up of office equipment and other items with little or no resale value.  He also stated the value of the Pueblo Assets reflected in the Debtor's statements and schedules had no bearing on fair market value, but then stated he had not formed a personal opinion as to the value of the Pueblo Assets.  The Court notes the Trustee did not prepare the statements and schedules.  They were prepared in part by Naro, who, although he stated the numbers and valuations were somewhat rough, relied on them in his testimony.[31]

---

[29] Stipulated Facts and Exhibits, ¶ 14.  See also n.1 thereto: ("Pueblo and Adam total the amount of the Pueblo Items in Schedule D as $899,815.35; the Trustee totals the amount as $897,304.99.  The parties agree to split the difference for purposes of this case.").  It should be noted Schedule B asks for "current value of the Debtor's interest in property."

[30] See Trustee's Exhibits 5 and 6, and testimony of Naro

[31] Naro signed the "Declaration Concerning Debtor's Schedules" on March 3, 2008, declaring them to be correct to the best of his knowledge, information and belief.  *(See* Underlying Case Docket No. 63.)

Naro testified he believed $1.66 million, the amount listed on the Debtor's schedule D, was the original cost of the Pueblo Assets. However, the parties stipulated the Pueblo County tax records of April 30, 2007 reflect an original cost of $1,086,399.00 for the Pueblo Assets. In addition, the parties agree the Debtor's books and records reflect the depreciated book value of assets listed as located in Pueblo as of December 21, 2007 was $873,139.88.[32] As noted by the Trustee, some of the equipment had been moved from the Pueblo location, but the Debtor's records did not reflect which equipment had been moved or where it had been moved. Moreover, as set forth above, the parties stipulated Pueblo County's tax records for tax years 2006 and 2007 assigned an actual value to the Pueblo Assets of $756,330, for purposes of deriving an assessed value and an assessed tax.[33]

In addition to his indication as to the acquisition value, Naro presented a spreadsheet listing acquisition prices and depreciation.[34] He prepared this spreadsheet from the Debtor's books and records. Naro's document conflicts with other statements of acquisition value of the Pueblo Assets because it lists the acquisition value of the Pueblo Assets as $1,364,256.99, and the net book value (acquired value less depreciation) as $850,000.00. Moreover, the parties' Stipulated Facts and Exhibits state "[t]he Debtor's books and records reflect a slightly higher depreciated book value of assets located in Pueblo as of December 31, 2007, totaling $873,139.88."[35] When asked to present his estimate of market value of the Pueblo assets, Mr. Naro testified he believed the Pueblo Collateral was worth $550,000.00.[36]

Therefore, the number that best meets the requirements this Court must consider in valuing Pueblo's lien in the proceeds from its collateral, is the most reliable of several unreliable sources–the parties' agreement that the Debtors' Schedule B reflected asset values for the Pueblo Assets of $898,560.15. This number is less than ideal because it is an estimate and is not based on a careful independent appraisal of each piece of property as it existed before the sale.

In addition, there was some evidence some equipment had been moved from the Pueblo location by the time of the petition. However, the Trustee's Exhibit 8, the list of such possible moved equipment, is unclear as to whether the equipment would still be

---

[32] Stipulated Facts and Exhibits, ¶ 15.

[33] See testimony of Gary Steffen and Pueblo's Exhibit F.

[34] Trustee's Exhibits 5 and 6.

[35] Stipulated Facts and Exhibits, ¶ 15.

[36] Essentially, this figure represents a 40% discount on the scheduled acquisition price. $550,000 is the product of $1.375 million and 40%. This figure, as noted by Naro, was close to a liquidation figure, and therefore does not meet the qualifications set forth in *Rash*. Further, the $873,139.88 figure and the $850,000.00 figure already factored in depreciation. Thus it is not clear to the Court why Naro further depreciated the assets down to $550,000.00.

subject to Pueblo's lien, or whether it would have violated the parties' agreement by being moved without Pueblo's permission. In addition, the sender of the e-mail listing the equipment that was or might have been moved did not testify at the hearing, so the Court has no way of assessing the accuracy of the list and thus will not consider it in determining value.

Thus, $898,560.15 is the only figure presented by the parties which has any of the characteristics identified by *LTV* and other cases. That is, Naro arrived at it, at least in part, by considering the values of individual pieces of equipment.[37] This fits the requirement of allocating sale proceeds by attributing them to individual assets.[38] In addition, although Naro's valuation work was admittedly incomplete and preliminary in nature, he testified he understood the sale of assets anticipated a going concern.[39] Moreover, it is a number which was agreed to by the parties, and which appeared in a listing of scheduled assets signed by Naro under penalty of perjury. Therefore, as noted by the *LTV* Court, the die is cast by § 506(a).[40] Although not necessary to the Court's decision, the $898,560.15 figure is also close to the Pueblo County Treasurer's actual value - at least more so than the Debtor's upper value of $1.2 million or Naro's lower value of $550,000. In this case, the evidence which most closely approximates what § 506(a) requires is the $898,560.15 valuation of the Pueblo Collateral, and this is the figure the Court will assign to the valuation of Pueblo's lien on the Sale Proceeds.

**D.   Reduction for Taxes**

The Court agrees with the Trustee's assertion the Pueblo County tax liens enjoy a first priority, and must be paid before other secured interests, pursuant to COLO. REV. STAT. § 39-1-107(s). At trial, and later in closing arguments, Pueblo attempted to assert the Trustee should have compromised the Pueblo County personal property tax debt for a lower amount, but offered no evidence as to how such a compromise could have occurred, given the Trustee's unrebutted testimony the County was oversecured. Accordingly, the tax amount paid by the Trustee to Pueblo County, in the amount of $30,000.00, must be deducted from the above $898,560.15.

---

[37] The Schedule B value is supported by Schedule B - Exhibit J, which is all the Debtor's personal property with columns designated for 1) Type of Property; 2) Description of Property; 3) Location of Property; and 4) Book Value @ 12/31/07. See Trustee's Exhibit 5, pp. 2–3.

[38] *LTV*, *supra*, at 267-268.

[39] *Id.*, at 268-269.

[40] *Id.*, at 269.

**E. Trustee's Asserted Surcharge**

Bankruptcy Code § 506(c) provides:

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all *ad valorem* property taxes with respect to the property.

The Court agrees with the Trustee's contention he is entitled to assert such expenses in this case.[41] The Court further agrees with Pueblo and Adam that the surcharge appears high. Although Pueblo and Adam dispute the claimed surcharge, they offered no evidence to rebut the Trustee's description of the expenses or the percentage requested. Therefore, although the Court finds the record on this point less than ironclad, it must use the unrebutted evidence before it, and not impose its own preference for what the evidence should have been. Thus, the Court finds the Trustee's original assertion of 17.75% as a representation of these costs and expenses to be reasonable in this instance. Accordingly, $159,494.43, or 17.75% of $898,560.15, will also be deducted.

## CONCLUSION

Based on the above calculations, the Court finds the value of Pueblo's lien to be $898,560.15, less $30,000 paid for Pueblo County personal property taxes and $159,494.43 for the Trustee's costs and expenses, for a total of $709,065.72.

IT IS THEREFORE ORDERED the value of Pueblo's lien is $709,065.72, and the Trustee shall disburse that amount to Pueblo from the Sales Proceeds.

Dated March 23, 2012               BY THE COURT:

Michael E. Romero
United State Bankruptcy Judge

---

[41] In addition, the Court recognizes the Pueblo County taxes discussed above may also be recovered as *ad valorem* property taxes in accordance with this subsection.